Samuel G. **EUBANKS, M.D.,**
et al., **Plaintiffs,**

v.

R. David **STENGEL, Commonwealth Attorney for Jefferson County,**
et al., **Defendants.**

No. CIV. A. 398CV383–H.

United States District Court,
W.D. Kentucky.

Nov. 5, 1998.

---

David A. Friedman, American Civil Liberties Union of Kentucky, Louisville, KY, A. Stephen Hut, Jr., Carrie Y. Flaxman, Matthew P. Previn, American Civil Liberties Union Foundation, Washington, DC, Catherine Weiss, Kimberly A. Parker, American Civil Liberties Union Foundation, Eve C. Gartner, Planned Parenthood Federation of America, New York City, for Plaintiffs.

N. Scott Lilly, Office of the County Attorney, Louisville, KY, Raymond Melvin Larson [Commonwealth Attorney], Margaret Kannenshohn, Fayette County Attorney, Lexington, KY, for R. David Stengel and Michael Conliffe.

D. Brent Irvin, Scott White, Office of the Attorney General, Frankfort, KY, for A.B. Chandler, III, Attorney General.

Donna L. Delahanty, Ky. Board of Medical Licensure, Louisville, KY, Marshall B. Woodson, Jr., Prospect, KY, for C. William Schmidt, Ky. Board of Medical Licensure.

Theodore H. Amshoff, Jr., Paul P. Clemens, Amshoff & Amshoff, Louisville, KY, for Kentucky Right to Life, Inc., et al.

## MEMORANDUM OPINION

HEYBURN, District Judge.

The Court is called upon to determine whether the Kentucky "Partial Birth Abortion Act," KY. REV. STAT. § 311.720, *et seq.* (the "Act") is valid and enforceable under the United States Constitution. Three physicians challenge the Act as unconstitutional because they say it prohibits almost every type of abortion procedure.[1] Defendants counter that the legislature meant to ban only one procedure—the partial birth abortion—which has become a prominent political and moral symbol in the continuing fight over abortion rights and the right to life. The Court has no interest in either validating or rebuking its symbolic importance. Nothing in this opinion should be so conceived.

Instead, the Court's inquiry is strictly a constitutional one. In such an inquiry, the most vital and delicate task is often the accommodation of competing rights. Though "all rights tend to declare themselves absolute," in practice this is rarely so.[2] Here, the

---

1. Only four physicians in Kentucky regularly perform abortions. Only three of them perform abortions after the 12th week of pregnancy. Those three are the individual plaintiffs in this case.

2. As Justice Holmes observed in *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828 (1908): "All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other

Court must accommodate three distinct rights, each of which asserts primacy: the state's interest in protecting potential life; the woman's right to terminate her pregnancy and to be free from an undue burden on that right; and the physician's due process right to know clearly when otherwise legitimate conduct becomes criminal. This opinion reveals the process of attempting to accommodate these competing interests.

## I.

For some time, Kentucky law has prohibited a physician from knowingly performing an abortion upon a fetus which is reasonably expected to have reached viability, except where the physician believes it is necessary to preserve the life or health of the mother. KY. REV. STAT. ANN. § 311.780 (Michie 1995). This statute permissibly accommodates all competing interests.

On April 14, .1998, the Governor signed legislation enacted by the Kentucky General Assembly declaring that "no physician shall perform a partial birth abortion." New provisions to KY. REV. STAT. ANN. § 311.720 define the proscribed procedure as follows:

(7) "Partial-birth abortion" shall mean an abortion in which the physician performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery.

(8) "Vaginally delivers a living fetus before killing the fetus" shall mean deliberately and intentionally delivers into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus.

The legislature also added the following sections to KRS 311.990:

(11)(a) 1. Any physician who performs a partial-birth abortion in violation of Section 2 of this Act shall be guilty of a Class D felony. However, a physician shall not be guilty of the criminal offense

if .the partial-birth abortion was necessary to save the life of the mother whose life was endangered by a physical disorder, illness, or injury.

2. A physician may seek a hearing before the State Board of Medical Licensure on whether the physician's conduct was necessary to save the life of the mother whose life was endangered by a physical disorder, illness, or injury. The board's findings, decided by majority vote of a quorum, shall be admissible at the trial of the physician. The board shall promulgate administrative regulations to carry out the provisions of this subparagraph.

3. Upon a motion of the physician, the court shall delay the beginning of the trial for not more than thirty (30) days to permit the hearing referred to in subparagraph 2 of this paragraph, to occur.

(b) Any person other than a physician who performs a partial-birth abortion shall not be prosecuted under this subsection but shall be prosecuted under provisions of law which prohibit any person other than a physician from performing any abortion.

(c) No penalty shall be assessed against the woman upon whom the partial-birth abortion is performed or attempted to be performed.

Plaintiffs challenge the constitutionality of the Act on several grounds. They say that the Act is so vague that one cannot know the procedures it prohibits. This is so, they say, because physicians do not know the meaning of words such as "deliver," "living," and "substantial portion." They contend that the Act's breadth would prohibit almost every significant abortion procedure used in Kentucky. They argue the absence of an exception allowing physicians to perform partial birth abortions if necessary for the health of the woman makes the Act unconstitutional.

than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. The limits set to property by other public interests present themselves as a branch of what is called the police power of the state. The boundary at

which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side."

They point out that in every other case except one courts have voided other partial birth abortion statutes on similar grounds.

Defendants argue that the legislature's true intent was to prohibit only one specific procedure, the partial birth abortion.[3] This is a procedure brought to national prominence by Dr. Martin Haskell of Ohio and known in medical circles as "dilation and extraction" ("D & X") or as "intact dilation and evacuation" ("Intact D & E").[4] Defendants focus on the state's compelling interest in protecting potential life and in preventing unnecessary cruelty to a partially born child. To a great extent they rely upon the decision and rationale of Judge J. Michael Luttig of the Fourth Circuit upholding a virtually identical statute in Virginia. *See Richmond Medical Center for Women v. Gilmore*, 144 F.3d 326 (4th Cir.1998).

Perhaps a statute specifically defining and prohibiting the Haskell or D & X procedure could survive a constitutional challenge on the evidence presented here. The Court is not called on to consider that precise question because the Act contains words which cover a broader scope of conduct. One of the Court's duties is to consider carefully the rights of those few who are within that scope.

The moral, factual and legal complexities of the abortion debate, and indeed the horrific descriptions of some abortion practices, make this decision a wrenching one. The Court has struggled to accommodate the legitimate and vital exercise of representative government with the rights of those the statute affects. In the end, the legislature's words prevent an accommodation which preserves all important rights.

## II.

The Court's consideration begins with a summary of the relevant procedural background and guiding legal principles.

Plaintiffs ask the Court to permanently enjoin enforcement of the Act on behalf of themselves and their patients. The Court has federal question jurisdiction because the case involves a challenge of a state statute under the United States Constitution. 28 U.S.C. § 1331. Plaintiffs have standing to raise the constitutional claim because they may face criminal prosecution under the Act and, thus, may seek pre-enforcement review. *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1993). Plaintiffs can assert

---

**3.** "Partial Birth Abortion" is not a medical term. The American College of Obstetricians and Gynecologists (ACOG) describes the procedure Congress sought to ban as an "Intact D & X" and stated it included four elements:

  1. deliberate dilatation of the cervix, usually over a sequence of days;
  2. instrumental conversion of the fetus to a footling breech;
  3. breech extraction of the body excepting the head; and
  4. partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

ACOG Statement of Policy, As issued by the ACOG Executive Board; Jan. 12, 1997. Throughout this opinion, the Court's use of the term "D & X" refers to this four part procedure.

**4.** The partial birth abortion came under public scrutiny following Dr. Martin Haskell's presentation of a paper at a medical conference hosted by the National Abortion Federation in 1992. "The dissemination of [Dr. Haskell's paper] to antiabortion activists set the stage" for the campaign to ban the procedure. David Brown, *Late Term Abortions; Who Gets them and Why*, WASHINGTON POST, Z12, (Sept. 17, 1996). Another physician Dr. James T. McMahon, who made a presenta-

tion at the same conference as Dr. Haskell, used the D & X/Intact D & E or "partial birth abortion" almost exclusively for the abortions he performed which were all after 24 weeks. Although most of Dr. McMahon's subjects suffered from conditions incompatible with life, a number of them suffered from conditions not so severe or fatal. *Id.* Thus, the fear became that this procedure was always performed on viable fetuses. Under these circumstances abortion opponents made the compelling argument that the procedure amounted to infanticide.

Since the time of Haskell's presentation, Dr. McMahon has died and Dr. Haskell has limited his practice of the D & X to abortions in the range from the 20th week to the 24th week of pregnancy. *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 191 (6th Cir.1997). Thus, the likelihood that D & X's are being performed on viable fetuses in Ohio (Dr. Haskell's home) and California (Dr. McMahon's home) has greatly diminished. The evidence in this case shows that no one performs the D & X in Kentucky. Thus, the "partial birth abortion" issue has evolved from one addressing fears of infanticide to one directed at pre-viability procedures. For many, this evolution does not alter their opposition to the procedure in the slightest. However, the constitutional ramifications of this evolution are potentially significant.

both their own constitutional claims as well as those of their patients because their own reaction to the statute affects the patients' rights and because the patients face many practical obstacles to asserting their own claims. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The issuance of a preliminary injunction is no longer at issue. The Court has received all the affidavits, testimony, and other evidence which the parties believe is relevant. Therefore, the sole issue is the constitutionality of the Act.

■ The Supreme Court's teachings on abortion rights are well known. A woman's right to an abortion before the fetus is viable is guaranteed under the Due Process Clause of the Fourteenth Amendment. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Casey,* 505 U.S. at 846, 112 S.Ct. 2791. Although the *Casey* plurality abandoned the *Roe* trimester framework, it did reaffirm a woman's unburdened right to a pre-viability abortion. A woman's right is not absolute in all circumstances. *Casey* reaffirmed the holding in *Roe* "that the state has legitimate interests in the health of the woman and protecting the potential life within her." 505 U.S. at 872, 112 S.Ct. 2791.

In *Women's Medical Professional Corp. v. Voinovich,* the court summarized succinctly the Supreme Court jurisprudence on two settled principles: (1) states may ban a particular abortion procedure pre-viability as long as the regulation does not create an undue burden on a woman's right to choose an abortion; and (2) subsequent to viability, states may " 'regulate and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' " 130 F.3d 187, 193 (6th Cir.1997) (quoting *Casey,* 505 U.S. at 879, 112 S.Ct. 2791). The Supreme Court explained that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of women seeking an abortion of a non-viable fetus." *Casey,* 505 U.S. at 877, 112 S.Ct. 2791. This "undue burden"

standard is the central focus of the Court's analysis.

Several other concepts inform the undue burden analysis. One is the requirement of statutory clarity in the area of criminal law. It rests on the premise that a person should be able to tell what conduct a law actually prohibits. Clarity invokes fundamental due process because "[v]ague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (footnote omitted). Moreover,

> Vague laws offend several important values ... because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.

*Id.* 408 U.S. at 108, 92 S.Ct. 2294. Laws failing to meet this standard may be void for vagueness.

■ All words contain some ambiguity. All criminal statutes necessarily contain a degree of vagueness. Such statutes need not have literal clarity to pass the constitutional scrutiny of providing fair warning. In this case, for instance, the Court ultimately concludes that the Act does provide a fair enough warning to those affected. However, vague language creates other problems as well. It can extend the scope of conduct which the statute governs. Moreover, courts demand extra clarity when constitutional rights are at stake. That is why "the degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *see also Voinovich,* 130 F.3d at 197 (quoting *Hoffman,* 455 U.S. at 499, 102 S.Ct. 1186; *Springfield Armory Inc. v. City of Columbus,* 29 F.3d 250, 252 (6th Cir.1994)). It is easy to see how the concept of vagueness is interrelated with and sometimes confused with that of overbreadth.

■ Statutes risk being overbroad when the legislature chooses words which implicate actual conduct which is constitutionally pro-

tected. "The Court has long recognized that ambiguous meanings cause citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)), *quoted in Hoffman,* 455 U.S. at 494, n. 6, 102 S.Ct. 1186. Overbreadth analysis in the context of an abortion law is inseparable from the Court's undue burden analysis under *Casey.* If the Act is indeed found to be overbroad, it will chill the conduct of physicians who provide legal abortions, thereby creating an undue burden on the rights of women seeking pre-viability abortions in Kentucky. How the Court undertakes this analysis determines the result in this case.

Because the Act has yet to be enforced, no one disagrees that Plaintiffs' challenge is facial. Not long ago, the Sixth Circuit discussed the standard for this type of challenge. *Voinovich,* 130 F.3d at 193–197.[5] Quoting *Casey,* it stated that "an abortion law is unconstitutional on its face if 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." ' *Id.* 130 F.3d at 194, (quoting 505 U.S. at 895, 112 S.Ct. 2791). In *Casey* the respondents argued that because the spousal notification requirement affected fewer than one percent of women seeking abortions, it did not affect a "large fraction of those cases in which [the law] is relevant." The plurality disagreed, saying that "the analysis does not end with the one percent of women upon whom the statute operates; it begins there. The legislation is measured for consistency

with the Constitution by its impact on those whose conduct it affects.... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey,* 505 U.S. at 894, 112 S.Ct. 2791.

Understanding this insight is integral to the analysis which this Court undertakes. It means that even though the Act's prohibitions may actually affect only a few women, those women's rights are still entitled to protection on a facial challenge if the Act creates an undue burden for them. Thus, to determine the viability of the Act, the Court must consider whether it imposes an undue burden upon those women who might lawfully choose or need a procedure the Act could prohibit.

■ That the Kentucky Act is similar to statutes in other states does not mean that the constitutional analysis is also identical. One analyzes the constitutionality of an abortion regulation by comparing generally known constitutional principles to the actual medical practices within the state. Indeed, this means that the actual medical practices within a state dictate the Court's constitutional analysis of a statute. The extent of those medical practices can dramatically affect the standing of the physicians in the state to challenge the statute and whether the statute is unconstitutional as an undue burden on women seeking an abortion.

### III.

With this in mind, the Court will review the procedures used by Kentucky abortion providers.[6] Plaintiffs have provided written

---

**5.** In *Voinovich,* the Sixth Circuit discussed at length whether the proper standard for reviewing a facial challenge to an abortion statute was governed by *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) or *Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The Sixth Circuit concluded that the *Casey* analysis and standard should govern. This Court happens to agree with that analysis. Regardless, it is the standard which now guides courts in this circuit.

**6.** Evidence regarding practice in Kentucky is that 78 to 80 percent of all abortions performed are for women in the first trimester of pregnancy. Estimates from the plaintiffs, Drs. Eubanks

and Marshall, are that together, they perform approximately 4000 abortions annually; that means approximately 3200 of the procedures they perform are first trimester abortions. The remaining 20–22%, or approximately 800 procedures, are second trimester abortions. Eubanks Declaration, ¶ 9, p. 3; Marshall Declaration ¶ 8, p.3; Hearing Transcript p. 192–93. This is consistent with data compiled by the Centers for Disease Control regarding abortions in Kentucky in particular and in 36 states and New York City for 1994. Lisa M. Koonin, *et al, Abortion Surveillance—United States, 1993 and 1994,* MORBIDITY AND MORTALITY WEEKLY REPORT, Vol. 46, No. SS–4, August 8, 1997, p. 64, 94 ("CDC statistics"). The CDC statistics indicate that 80% of abortions

and oral testimony about their practices. Depending on the length of the pregnancy,[7] the abortion providers use one of three procedures: (1) suction and curettage (also known as vacuum aspiration); (2) induction and (3) dilation and evacuation ("D & E").[8] The D & X procedure is not performed in Kentucky. The details of abortion practice are not those which one can describe neatly or without discomfort. Nevertheless, the Court must summarize the evidence about each.

Suction and curettage or vacuum aspiration are interchangeable terms and refer to the procedure most frequently used in abortions through the twelfth week of pregnancy. It involves dilation of the cervix and insertion of a plastic tube or cannula into the uterus. Suction applied to the tube removes fetal tissue and other products of the pregnancy from the uterus, through the tube. Eubanks Declaration ¶ 11, p. 4; Marshall Declaration ¶ 10, p. 3; *see Evans v. Kelley,* 977 F.Supp. 1283, 1292 (E.D.Mich.1997). This process, in fact, kills the fetus; further action is neither taken nor necessary.

The induction method is preferred for some late pre-viability abortions and for all postviability abortions. Eubanks Declaration ¶ 12, p. 5; Marshall Declaration ¶ 11, p. 4. Induction abortions take place in hospitals and involve inducing pre-term labor. This method is not available until after 16 weeks. It is used typically in later term abortions by the introduction of labor-inducing agents that cause labor contractions to begin. The fetus emerges intact and the woman experiences the risks and pain associated with full-term delivery. Usually, the fetus dies from the process, either by introduction of labor inducing agents [9] or from the cutting off of oxygen and nutrients because of the contractions. Hearing Transcript, 212–13. Kentucky physicians use the induction procedure occasionally for abortions pre-viability and exclusively for the rare abortions they perform during the third trimester for fetuses incompatible with life. Eubanks Declaration ¶ 12, p. 5; Marshall Declaration ¶ 11, p. 4.

For abortions between the 12th through the 23rd weeks, both Drs. Marshall and Eubanks use a version of the conventional D & E procedure. In this procedure, the physician dilates the cervix more widely than is done for vacuum aspiration. For pregnancies from 13 to 16 weeks, dilation occurs over a few hours; for those after 16 weeks, dilation occurs overnight. After using forceps or other instruments to rupture the membranes and suctioning amniotic fluid, the doctor then inserts surgical instruments through the cer-

performed in Kentucky in 1994 were performed on pregnancies at the 12th week or earlier; of those performed after the 12th week, 13.7% were performed between 12 and 20 weeks; and 2.2% were performed at or after 21 weeks. The remaining 4.1% were performed on fetuses of unknown or unreported gestational age.

The Plaintiffs do not provide estimates on the number of abortions they perform per given week of gestation. If the above-listed CDC percentages are applied to Drs. Eubanks' and Marshall's practice, the following numbers result: 80% or 3200 are performed up until 12 weeks; 13.7% or 548 of the procedures performed by Drs. Eubanks and Marshall are done between 12 and 20 weeks; and approximately 2.2% or 88 of the procedures they perform take place at 21 weeks or beyond. Although CDC percentages would indicate 4.1% or 164 are performed on fetuses of unknown gestation, the testimony does not support this; apparently, the Plaintiffs are able to account for the gestational ages of all fetuses that are the subject of Plaintiffs' procedures.

7. There are several methods of measuring the length of a pregnancy. In this case, all references are from the first day of the last menstrual period. *Casey* termed viability as "the time at which there is a realistic possibility of maintaining and nourishing life outside the womb." *Casey,* 505 U.S. at 870, 112 S.Ct. 2791. The parties stipulate that there is a 25% chance of viability at the 24th week of gestation. Hearing Transcript, 227.

8. Although Hysterotomy and Hysterectomy are also procedures used to terminate pregnancies, they are not relevant to this discussion or implicated in the ban. Hysterotomy is the surgical transabdominal removal of a preterm fetus from the uterus. This would essentially be a Caesarean section performed pre-term. Hysterectomy is the removal of the uterus. These two forms of pregnancy termination are rare and not in issue in this case because neither involve vaginal delivery.

9. Testimony on Kentucky abortion practice indicates that instillation of saline or urea is not the method of choice. Rather, Kentucky physicians use prostaglandins to induce labor and introduction of those alone do not kill the fetus.

vix and into the uterus to remove fetal tissue and the placenta. The process sometimes results in dismemberment or disarticulation of the fetus either in utero or in the vagina. Hearing Transcript, 196. Dr. Eubanks says that in 40 to 50 percent of his D & E abortions he delivers into the vagina a part of the fetus intact. Hearing Transcript, 195. Dr. Marshall's testimony was similar. He stated that in such a procedure he will draw part of the fetus into the vagina before detaching it. In a "great majority" of his D & E procedures, disarticulation of a fetal part occurs only after he has delivered at least a limb intact to the vagina. Marshall Supplemental Declaration, ¶ 5(h), p. 9. These results are a consequence, Eubanks says, of his intent to bring as much of the fetus into the vagina as possible, thereby reducing the number of entries into the uterus. Hearing Transcript, 205. The procedure is usually done in a clinic instead of a hospital. Hearing Transcript, 234.

The Court refers to Plaintiff's procedures as a version of the conventional D & E because evidence in the record indicates doctors performing D & Es use slightly different procedures, even though all agree that the D & E is the preferred method for second trimester abortions in Kentucky and nationwide. This discussion also bears out the difficulty of attaching rather general definitions to specific medical procedures, even procedures which are well-known to physicians.

According to Defendants, the conventional D & E involves dismembering the fetus inside the uterus using surgical instruments then removing the pieces through a dilated cervix. Defendants' Pretrial Brief, 9 (quoting Martin Haskell, M.D., *Dilation and Extraction for Late Second Trimester Abortion,* in PRESENTATIONS, BIBLIOGRAPHY & RELATED MATERIALS, SECOND TRIMESTER ABORTIONS: FROM EVERY ANGLE, FALL RISK MANAGEMENT SEMINAR (Nat'l Abortion Federation, 1992) at 28, *provided in* Defendants' Appendix, 237). Plaintiffs do not describe dismembering the fetus in the uterus as being an objective part of the procedure they consider a D & E. Hearing Testimony, 193–94; Eubanks Declaration, ¶ 11, p. 4; Marshall Declaration, ¶ 9,

p. 3–4. The American Medical Association ("AMA") identifies a D & E as the primary procedure used in early second-trimester abortions, from the 13th to 15th weeks. That organization also indicates its use as one of several options for mid- and late-second trimester abortions, along with the D & X, labor induction, hysterotomy and hysterectomy. The AMA notes, "Because the fetus is larger at this stage of gestation (particularly the head), and because bones are more rigid, dismemberment or other destructive procedures are more likely to be required than at earlier gestational ages to remove fetal and placental tissue. Some physicians use intra fetal potassium chloride or digoxin to induce fetal demise prior to a late D & E (after 20 weeks), to facilitate evacuation." AMA Report of the Board of Trustees, B of T Report 26–A–97, at 8, *provided in* Defendants' Appendix, 185 ("AMA Report"). Kentucky physicians do not introduce any agents to induce fetal demise to facilitate removal of the fetus during a D & E.

Furthermore, in addressing early, second-trimester D & Es, the AMA does not describe a procedure in which the physician purposefully dismembers the fetus in uterus, but "[b]ecause fetal tissue is friable and easily broken, the fetus may not be removed intact." AMA Report at 8, *provided in* Defendants' Appendix, 185. Plaintiffs' expert Dr. Hausknecht testified that in his practice, the D & E is used from the 13th or 14th week until the 21st or 22nd week of gestation. Plaintiffs use the D & E from the 12th week through the 23rd week. Dr. Boehm, Defendants expert, testified that in his practice, D & E's are done only through the 16th or 17th week. Hearing Transcript at 106. Moreover, he only dilates the cervix briefly, for a few minutes, using mechanical dilators in the operating room. Hearing Transcript, 111. This contrasts to Dr. Hausknecht's practice of using osmotic dilators over several hours, Hearing Transcript, 116; or Dr. Eubanks testimony that he might use osmotic dilators to dilate some patients overnight. Hearing Transcript, 193; Eubanks Declaration, ¶ 11, p. 4. Defendants' expert Dr. Boehm admitted that the decision to use D & E through a particular week of gestation

"varies from state to state, doctor to doctor." Hearing transcript at 112.

Having reviewed this evidence, the Court observes that Kentucky abortion providers undertake a procedure that many doctors would agree is a "conventional D & E." Those same doctors, however, may vary their own D & E practice in small but significant ways. Several factors might account for these differences, such as personal preference, training, and expertise of the physician, the medically relevant facts of the case, and the doctor's sound medical judgment. The differences in D & E practice among doctors across several states highlight the need for the Court to consider how the Act affects practitioners in Kentucky with little regard for medical practices, similar statutes, and constitutional challenges in other jurisdictions.

## IV.

The Court now turns to interpret the Act. The core of Defendants' argument, asserted repeatedly, is that the legislature intended to prohibit only the D & X. However, as Justice Holmes reminds us, "[w]e do not inquire what the legislature meant; we ask only what the statute means." [10] Thus, the Court must consider the constitutionality of the group of words, selected and arranged by the General Assembly, presumably intended to ban whatever they encompass. In subsection A, the Court analyzes those words to gain some literal sense of the Act's meaning. The Court concludes that doctors have fair notice that it does not proscribe two commonly used procedures. In subsection B, the Court finds that the Act's "substantial portion" language broadens its scope to reach a significant number of the D & E's as performed in Kentucky. This reach constitutes an undue burden on some women seeking a lawful abortion. In subsection C, the Court discusses why it cannot simply accept the legislature's supposed intent to ban only the D & X procedure. In Subsection D the Court summarizes its conclusions that the Act will chill the exercise of necessary and constitutionally protected conduct.

### A.

■ Judges and academics have produced volumes on the process of statutory interpretation. All would agree that one must start with an understanding of the words within the context of their general purpose. Every criminal statute has the purpose of prohibiting some evil. Here, the evil to be prohibited is the partial birth abortion, which KY. REV. STAT. ANN. § 311.720(7) defines as the two step process of (1) partially vaginally delivering a living fetus and (2) killing it. One can immediately sense the delicacy in defining the prohibited procedure, as most abortions may fall within this rather general definition. The legislature had to be more specific and it was. It provided its own definition in KY. REV. STAT. ANN. § 311.720(8). That definition adds only two new concepts: (1) that the entire procedure and each step of it must be intentional and (2) that a substantial portion of a living fetus be delivered into the vagina before the killing of it.

Plaintiffs argue that this definition includes within its scope of prohibited conduct any method in which the fetus is delivered and killed in the same procedure. The Court rejects this interpretation of the Act. By stating that the delivery must occur "before" the killing, the subsection (8) definition expressly prohibits only a several-step process, not a single procedure which delivers the fetus and kills it at virtually the same time. That other clearer words might have been omitted does not make the existing words insufficient.

■ Plaintiffs also argue that a completely detached portion of the living fetus may constitute a "living fetus" under the Act. Such an interpretation seems inconsistent with logical meaning of the words. Common sense implies that a "living fetus" must have a heartbeat and so be capable of life, at least for a moment. A limb or lower torso, detached in the uterus and delivered to the vagina, is capable of neither having a heartbeat nor sustaining life and, thus, is not "living" in the commonly understood sense. Moreover Plaintiffs' interpretation is contrary to the legislature's obvious intent of the

**10.** Oliver Wendell Holmes. *The Theory of Legal Interpretation*, 12 HARV L. REV 417, 419 (1899).

words. Everyone agrees that the Act does not prohibit dismembering or killing a fetus in the uterus or cervix, so long as no portion of the fetus is outside the cervix. Thus, once a physician lawfully dismembers a fetus and makes death inevitable, the state has no legitimate reason to prohibit a later procedure which merely finalizes the death. Sensibly, the Act does not appear to cover such actions.

More important for our purposes, the Court's interpretations mean that the Act most certainly does not prohibit two commonly used procedures—suction and curettage, and induction. In the suction and curettage or vacuum aspiration, the act itself of suctioning out the fetal tissue kills the fetus. No subsequent or separate procedure is needed to kill the fetus. The physician does not expect the fetal tissue to be "living" upon suctioning from the uterus. Thus, at several basic levels suction and curettage falls outside the Act's definition. The induction procedure likewise is not prohibited. Although induction includes vaginal delivery, the delivery itself kills the fetus on virtually every occasion, either prior to the fetus' entering the vagina, or while there because the induced contractions cut off the supply of oxygen. No separate act by the physician is anticipated or required. In sum, only forced or artificial interpretations of the Act could expand its scope to include these procedures.

### B.

To complete its interpretation, the Court focuses now on whether the Act's "substantial portion" language is so broad that it includes a significant number of D & E's as Plaintiffs perform them in Kentucky.

The word "substantial" has several threads of meaning. It can imply an ample or considerable size, an essential or material part of

a thing, or a strong or solid physical character.[11] In the context of the Act, the Court cannot say precisely what might comprise a substantial portion of a fetus measuring between nine and twelve inches in length and weighing between one and two pounds. Neither can physicians.[12]

For example, even a small portion could be vital and, thus, substantial. Could not a substantial portion of 9 inches be 3 inches? Could not a substantial portion of 2 pounds be 3/4 of a pound? A substantial portion need not be the largest part or more than half. Could not a limb be deemed "substantial" because it is a considerable part, a material or important part of the body and because it has a solid physical character? As best the Court can determine, the legs of the fetus represent about 35 to 40 percent of its overall length between the 20th and 24th week. *See Diagram Illustrating Changes in Size of Human Fetus*, Defendants' Appendix, 138. Could not a physician or a prosecutor reasonably believe limbs of this proportion to be a substantial portion of the fetus? The Court concludes that they could. If so, then the term "substantial" in this context has a breadth of meaning which greatly expands the Act's coverage beyond a D & X.

To be sure, the word "substantial" is not inherently vague. In many other contexts its use would raise no question. For instance, frequently in D & E's performed in Kentucky and apparently in other states, no portion of the fetus is delivered intact into the vagina. Hearing Transcript, 111, 195. No definition of "substantial" would implicate a D & E performed in those circumstances. However, context is vital to meaning.

In the context of Kentucky abortion practice the term "substantial" suffers for lack of precision, resulting not so much in vague-

---

11. *See* RANDOM HOUSE UNABRIDGED DICTIONARY 1897 (2d ed.1993).

12. The witnesses do not agree on the meaning of "substantial" in this context. Drs. Eubanks, Marshall and Hansknecht say that they are uncertain about the meaning of substantial portion. Eubanks Declaration, ¶ 26, p. 9; Marshall Declaration, ¶ 19, p. 6–7; Hearing Transcript, 59–60; 68; 197–98. They say that it could include an

arm or a leg. Dr. Boehm says that it means a "considerable size" which would not include a limb. Hearing Transcript, 104–5. Nevertheless, he concedes that it is a question about which reasonable people may disagree. Dr. Boehm seeks to downplay the importance of the "substantial portion" debate by asserting that, in any event, no physician ever intends to deliver a substantial portion when performing a D & E. Hearing Transcript, 123–24.

ness, as in overbreadth. By adopting such broad language, the legislature has fashioned a statute which may prohibit procedures which Drs. Eubanks and Marshall normally and intentionally carry out in pregnancies up to the 23rd week of pregnancy. Indeed, Plaintiffs have notice of what the Act may prohibit—and one such procedure is the natural, probable, and in many respects, intended consequence of a D & E performed during the later stages of pre-viability pregnancy. Consequently, the Act may reach a significant amount of constitutionally protected conduct, even though neither Drs. Eubanks nor Marshall perform a conventional D & X or the Haskell procedure. For reasons of medical safety, both Drs. Eubanks and Marshall do try to bring as much of the fetus into the vagina as possible when performing a D & E. This intent has important ramifications under the Act. About 40 to 50 percent of the time they deliver a leg or arm or more of the fetus intact into the vagina. Hearing Transcript, 195. When doing this, Eubanks considers a leg, two legs, or two legs and the buttocks to be a "substantial portion." Hearing Transcript, p. 197. They do this "before" then performing a procedure or procedures which they know will kill the fetus.[13]

Comparing the words of the Act with the actual medical practice, one can see the truth of the belief that "meaning resides not simply in the words of a text, for the words are always pointing to something outside."[14] Here, the words point to procedures in Kentucky which are often necessary to guarantee a woman's right to lawful abortion of a nonviable fetus. The words point to procedures that cover as many as 40 to 50 percent of the D & E's Plaintiffs perform. The words point to the rights women might lawfully exercise. By doing so, the words and the Act they comprise create an undue burden upon the women who seek only to exercise their rights.

## C.

In Defendants' memoranda, they make almost no attempt to define the term "substantial portion." Instead, under the umbrella of legislative intent, they try to characterize partial birth abortion, the D & X procedure, and definitions in subsections (7) and (8) as synonymous. Defendants insist that "there can be little doubt" that the General Assembly intended to proscribe only D & X abortions. Because this intent is so clear, Defendants say that the Court should respect it and hold the Act constitutional.

Defendants cite the congressional debates and legislative history of the federal partial-birth abortion ban as evidence that the D & X/Intact D & E is what the Kentucky General Assembly intended to ban. They point out that during the congressional debates, "the AMA and the American College of Obstetricians and Gynecologists ("ACOG") both equate[d] the terms 'partial birth abortion' with the D & X procedure." Defendant's Pretrial Brief, 6. Whether the AMA believes that a partial birth abortion is or is not the same as a D & X is of little consequence to the Court's analysis. If the definitions of these procedures were so clear, however, the legislature would have had no need to provide its own definition.

In the General Assembly's debate, the term "partial birth abortion" was referred to as a procedure having the following steps: (1) dilation of the cervix over several hours, usually two days; (2) manipulation of the fetus into a breech position so that the feet of the fetus exit the uterus first before the torso, upper body, or head; (3) extraction of an intact fetus, in the breech position, through the cervix, out of the uterus and into

---

13. On extremely rare occasions each physician may inadvertently deliver into the vagina an entire fetus up to the head. Hearing Transcript, 198, 240; Marshall Supplemental Declaration, ¶ 5(k). The Court is not concerned by these inadvertent occurrences, because they happen on such rare occasions—less than 1%—that one could never suggest either that they are intentional or anticipated.

14. See RICHARD A. POSNER, THE PROBLEMS OF JURISPRUDENCE 296 (1990). When Judge Posner referenced "something outside" to which words invariably point, he may have been considering something more than just the actual conduct that might be proscribed by the words. He may have been pointing to the political culture in which laws are promulgated. Part of that culture or context includes the current practices of those to whom the words are directed and how those affected would reasonably interpret them.

the vagina up to the head of the fetus (which remains in the uterus); (4) decompression of the cranium of the fetus, which kills the fetus and which facilitates complete removal of the fetus from the uterus and out of the woman's body. *See* footnote 3, *supra*. *See also* Videotape, House Judiciary Committee, Mar. 19, 1998; Videotape, House Floor Debate, Apr. 1, 1998; Defendant's Appendix, 244. However, the Court cannot simply ignore the legislature's statutory definition of the prohibited conduct in favor of one which is nowhere referenced in the Act. This is particularly true when the General Assembly refused to adopt a more precise definition describing the D & X. Videotape, House Floor Debate, April 1, 1998.

The differences between the two definitions are quite dramatic. The Act does not include or discuss, for example, deliberate dilation of the cervix over several hours or days. The Act does not address a physician's manipulation of the fetus into a breech position, so that the feet of the fetus exit the uterus first. The Act does not discuss an extraction of an intact fetus through the cervix and into the vagina up to the head of the fetus. Nor does the Act address decompression of the cranium of the fetus to kill the fetus, to get the fetal head out of the uterus and facilitate complete removal of the fetus from the woman's body. To be sure, to "deliver[ ] into the vagina a living fetus, or a substantial portion thereof," encompasses extraction of an intact fetus, in a breech position, into the vagina up to the head. A "substantial portion" of a living fetus certainly would mean a fetus from the neck down. It also could mean something less than that. True, "kills the fetus" encompasses the act of decompressing the cranium of the fetus. It also encompasses virtually every other method of fetal demise.

By adopting a considerably less precise definition of a partial birth abortion, the legislature not only defined the terms of its prohibition, but also said a lot about its own collective intent. Though the Act calls itself a partial birth abortion ban, it is not. The title is misleading, both medically and historically. No one, not even Defendants' counsel, can deny that the General Assembly selected words that encompass more than the D & X and a lot more than the procedure Dr. Haskell first described. *See* Hearing Transcript, 28–29. One could think of many reasons for this. Perhaps the legislators feared that physicians could easily circumvent a more precise definition. However, the Court need not approve of or even understand the legislature's exact reasoning.

The committee and floor debates concerning this Act show the legislature's collective intent was quite a bit less precise than Defendants suggest. To be sure, numerous legislators did intend to ban the D & X. However, others sought an extra measure of prohibition to cover procedures related to or derivative of the D & X. Still others warned that the language might cover a D & E. A few seem to disregard the constitutional arguments and push for language which they believed would make abortions more controllable. This hodgepodge of intent provides the Court with direction, but no meaning.[15] Certainly, it establishes no meaning so clear that it can override the broad language of the Act.

The Court has not gone out of its way to conjure up a hypothetical constitutional clash where none actually exists. *See United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). The clash is neither ancillary nor inadvertent. The legislature focused directly on protected activity in a manner which everyone knew might be unconstitutional. The legislature could have passed a statute of more limited reach and still achieved its supposed objective. Instead, it decided to go farther. Indeed as is sometimes the case in controversial issues, the legislature seems to have striven for, in Justice Frankfurter's words, a "purposeful ambiguity."[16] That is quite a different purpose than the one suggested by Defendants.

---

**15.** *See* Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation,* 17 Harv J.L. & Pub. Pol'y 61, 68 (1994).

**16.** Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Col. L. Rev. 527 (1947).

### D.

By concluding that the Act places an undue burden on women who seek to exercise their constitutional right, is the Court saying that prosecutors surely would exercise their discretion to prosecute such cases? Does the Court mean to say that Plaintiffs would be indicted and convicted under the Act? The Court does not mean to say so. Nor does it need to. One must concede that these are open questions. It may be fairly argued that Plaintiffs' conduct is just at the margin of legality. It is true that "all criminal laws chill conduct that is at the margins of legality." *Voinovich,* 130 F.3d at 214 (Boggs, J. dissenting). However, where that margin of legality intersects another's constitutional rights, otherwise acceptable "chilling" takes on a whole new significance.

Sometimes legal analysis can seem like a captious word game, particularly when real lives and the most fervently held moral beliefs are at stake. However, one cannot ignore the words of the statute which point directly at each. The words are important because they have purpose. That purpose is to guide the actions of men and women. The words guide the actions of the few Kentucky physicians performing abortions. The Court must ask whether those physicians, given their conduct and the wording of the Act, have reason to fear prosecution. The Court must ask whether some conduct of those physicians is actually subject·to prosecution under the Act. The Court must answer both questions "yes." The Court need not know that prosecutors will actually bring a charge. That the statute is so broad that it includes current legal abortions is enough to chill the conduct of those physicians. Instead of banning only a procedure not used in Kentucky, the Act's real impact is making physicians fearful that their constitutionally meaningful conduct is criminalized. Under this Court's analysis, that fear is both reasonable and credible. That fear makes the Act burden the exercise of constitutional rights by women seeking late-second trimester abortions.

The Court concludes that by choosing words having a broader scope, the legislature moved from arguably firm constitutional ground—banning a very limited procedure used for late term abortions—to a quagmire of constitutional infirmity—banning a set of actions and results that embrace common and otherwise legal abortion procedures which Plaintiffs regularly use. This creates an undue burden upon a large fraction of those women whom the Act will affect.

### V.

One principle of democracy is the right of a majority to enact certain moral judgments as laws. To uphold those enactments affirms democracy and the people's sense of morality. Consequently, courts should look for ways to avoid constitutional difficulties and uphold statutes. *See Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991). Therefore, the Court must consider carefully any other arguments or interpretation which might accommodate these principles.

### A.

Defendants suggest that the Court should impose its own more precise construction upon the phrase "substantial portion." To be sure, laying down either a definitive or narrower meaning for this term would have a great many benefits in these circumstances.

Federal courts have always struggled to say how far they should go in defining state statutes so they are constitutional. On one hand, "[w]hen a statute is 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Eubanks v. Wilkinson,* 937 .F.2d at 1122 (quoting *Virginia v. American Booksellers Assn.,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988))(internal quotations omitted). On the other hand, "[e]xtrapolation, of course, is a delicate task, for it is not within our power to construe and narrow state laws." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

One possibility here is to construe "substantial portion" to comport with a responsible definition of a D & X. To accomplish this would require the Court to define "substantial portion" as meaning "four-fifths of the fetal body" or "the fetal body up to the head." Unfortunately, nothing in the lan-

guage of the Act supports such an interpretation. The Act contains no reference to a fractional proportion of the fetal body nor to any fetal body part—head, neck, or shoulders. Indeed, the legislature rejected such a definition. Videotape, House Floor Debate, April 1, 1998. It is hard to fathom how the Court could limit the Act to mean only a D & X when it is clear that the language encompasses more.

Another possibility that might save the Act is to construe "substantial portion" to mean "more than half." The evidence shows that Plaintiffs anticipate more than half of a fetus to present into the cervical os (i.e., opening) and be delivered into the vagina very rarely—so rarely that it could not possibly `be said to be their intent. Hearing Transcript, 198, 240. Were the Court to impose such an interpretation the Act might be saved. The Court rejects this interpretation for many of the same reasons it refuses to say "substantial portion" means "four-fifths" or "up to the head." The Court has found no definition of "substantial" as meaning only more than half. Moreover, it is not an interpretation clearly offered by the state as a saving construction, although one of their experts stated that this would be his personal interpretation. Hearing Transcript 105–106. Nothing in the language of the act supports "more than half," and nothing in the legislative history indicates this meaning was one intended by the legislature.

In the final analysis, these Defendants' limiting constructions are more convenient than plausible. To adopt any one of them would be nothing more than putting words in the legislature's mouth.[17]

## B.

The Defendants also argue that the Act's strong *mens rea* elements prevent the Court from finding it unconstitutional. They say that the Act prohibits *intentional and deliberate* delivery of a living fetus or a substantial portion thereof into the vagina, which is not the intent of physicians performing D & E's in Kentucky. Defendants' Pretrial Brief, 30 (quoting *Richmond Medical Center for Women v. Gilmore*, 144 F.3d at 330). They argue, through Judge Luttig, that when a portion of a living fetus is delivered into the vagina during a D & E, it is done so as "a result of 'luck' rather than deliberation and intent." *Id.* (quoting *Gilmore*, 144 F.3d at 330).

To be sure, some courts have concluded that strong *mens rea* language can cure problems of vagueness.[18] However, the *mens rea* language here is purported to solve a problem which the Court found does not exist. The Court has concluded that the Act is not void due to vagueness. The strong *mens rea* language does not reduce the Act's reach and, therefore, cannot cure that constitutional defect. Its presence does not change the Court's analysis of the undue burden. Kentucky law and the facts in evidence preclude that.

---

**17.** Defendants urge the Court to certify the statutory construction issue to the Kentucky Supreme Court. The Court seriously considered this alternative. The most compelling argument for certification is that this Court lacks the power to offer any limiting statutory constructions that would bind Kentucky state courts. Where, however, sensitive constitutional rights are implicated, and where the statute is not obviously susceptible to a limiting construction that saves its constitutional infirmity, the Court concluded that certification is not appropriate. *See Houston v. Hill*, 482 U.S. 451, 471, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). Certification of this issue would essentially be sending the entire constitutional question to the Kentucky Supreme Court—an inappropriate use of certification. *Id.* 482 U.S. at 471 n. 23, (citing 17 C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4248, pp. 529–530 (1978)).

**18.** *See, e.g., Voinovich*, 130 F.3d at 203–4 ("Statutes imposing criminal liability without a mental culpability requirement are generally disfavored") (citing *Staples v. United States*, 511 U.S. 600, 605–6, 114 S.Ct.` 1793, 128 L.Ed.2d 608 (1994); *Evans v. Kelley*, 977 F.Supp. 1283, 1305 (E.D.Mich.1997)) ("the lack of a *mens rea* or specific intent requirement in a statute which imposes criminal liability also may indicate that the statute is unconstitutionally vague") (citing *Colautti v. Franklin*, 439 U.S. 379, 395, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Summit Medical Associates v. James*, 984 F.Supp. 1404, 1444–46 (M.D.Ala.1998))(holding *mens rea* element of recklessness could cure vague criminal statute pertaining to abortions performed at viability). *See also Gilmore*, 144 F.3d at 328, 329, 331 (discussing the *mens rea* elements of the Virginia partial birth abortion ban).

Kentucky Revised Statute § 501.020(1) defines "intentionally" as it is to be applied in criminal prosecutions as follows:

"Intentionally"—A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause that result or to engage in that conduct.

Kentucky's Supreme Court has stated "[i]ntent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense." *Parker v. Commonwealth,* 952 S.W.2d 209, 212 (Ky.1997) (citing *Davidson v. Commonwealth,* 340 S.W.2d 243 (Ky.1960); *Wilson v. Commonwealth,* 601 S.W.2d 280 (Ky.1980); *Claypoole v. Commonwealth,* 337 S.W.2d 30 (Ky.1960)); *see also Smith v. Commonwealth,* 737 S.W.2d 683, 688 (Ky. 1987).

Plaintiff's testimony clearly indicates that they lack the conscious objective to carry out a D & X. Marshall, Supplemental Declaration ¶ 5(k). However, the Act encompasses more than the D & X. Dr. Eubanks testified that 40 to 50 percent of the time he does a D & E that some portion—a substantial portion—of the fetus presents in the vagina, while it is still intact and before it is dismembered. Hearing Transcript, 195. Moreover, Dr. Eubanks testified that "each time you insert your instruments into the uterus, ... the uterus can be perforated." Hearing Transcript, 205. Thus, he further testified, it is part of his conscious objective to insert instruments into the uterus as few times as possible and that each time he does insert instruments into the uterus, he does so with the intent to bring out as much as the fetus as possible. Hearing Transcript, 205. Clearly, the natural and probable consequences of performing a conventional D & E are that a substantial portion of the fetus will present into the vagina; that the physician will deliver that portion into the vagina; and that subsequent acts by the doctor will then kill the fetus. This has implications under the Kentucky penal code which must be recognized. By the definition in KRS 501.020, Plaintiffs do have as their conscious objective

to cause a result or to engage in conduct which the Act prohibits. Thus, based on the evidence presented here, the *mens rea* language of the Act would not exclude Plaintiffs' conduct.

### C.

Defendants argue that the Plaintiffs face no credible threat of prosecution because, in Defendants' opinion, conventional D & E abortion procedures remain lawful under the Act. Defendants' Post Hearing Brief, 16. To physicians facing imprisonment or the loss of their medical license, the threat cannot be so lightly cast aside. *See* Section IV(D), *supra.* Nor is it logical for the Court to give much weight to Defendants' promise that they would not prosecute Plaintiffs for performing an abortion in their usual manner. Hearing Transcript, pp. 202–205.

These arguments and Defendants' assurances only make sense if one agrees with Defendants' interpretation of the Act as reaching only a D & X. The Court, however, has found the Act broader than that. *See* Section IV(C), *supra.* "It will not do to say that a prosecutor's sense of fairness and the Constitution would prevent a successful ... prosecution for some of the activities seemingly embraced within the sweeping statutory definitions." *Baggett v. Bullitt,* 377 U.S. 360, 373, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Defendants' assurances are particularly unconvincing given their admission that the terms of the statute reach something more than a D & X and given the legislature's clear intent to have a definition somewhat broader than one limited to the D & X. Defendants place themselves in the untenable position of asserting that the Act is constitutional as drafted, while simultaneously saying that they will not enforce the Act to its full scope.

The opinion of the state's counsel at the hearing is neither binding on this Court nor is it constitutionally sufficient. "[T]he Attorney General does not bind the state courts or local law enforcement authorities," and accepting a statement made at the hearing as authoritative would be ill-advised. *See Virginia v. American Booksellers Ass'n Inc.,* 484 U.S. at 394, 395, 108 S.Ct. 636 (1988); *Bag-*

*gett,* 377 U.S. at 373, 84 S.Ct. 1316. In those occasional cases where the interpretation of persons charged with a law's enforcement carry great weight before the Court, years of policy and practice support those interpretations. *See Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (acknowledging the court may consider "perhaps to some degree . . . the interpretation of the statute given by those charged with enforcing it"); *see also Poe v. Ullman,* 367 U.S. 497, 501, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)(statute being challenged had been on the books since 1879 and was never meaningfully enforced). They are not cases, such as this, involving a pre-enforcement challenge.

Finally, the assurances themselves are insufficient. They came in the form of a brief statement made at the hearing after the State's attorneys conferred, following a cross-examination of the Plaintiff, Dr. Eubanks. Lacking was an unequivocal denunciation of prosecution for carrying out a D & E procedure. Such a denunciation should rarely be relied upon in any case. In the final analysis, these assurances are little more than a snapshot of prosecutorial discretion. In these circumstances, that is simply not assurance enough. A single prosecutor's promise cannot trump the Court's interpretation.

### D.

Defendants use most of their post-trial brief to urge upon the Court the merits of Judge Luttig's opinion in *Richmond Medical Center for Women v. Gilmore,* 144 F.3d 326 (4th Cir.1998). Because the Virginia statute is substantially identical to the Kentucky Act, they conclude that this Court should follow Judge Luttig's analysis and conclusion. The Court has carefully reviewed Judge Luttig's opinion and is impressed with much of its

analysis.[19] However, for a variety of reasons its conclusions are unpersuasive here.[20] Because Defendants rely upon it so exclusively, a few additional comments are appropriate.

While the Virginia and Kentucky statutes are identical, the constitutional analysis is different as to each. That analysis is dictated by the scope of actual conduct proscribed. Judge Luttig considered the specific D & E procedures in Virginia, which are quite different from the results which Drs. Marshall and Eubanks experience. Different facts yield different legal results. Judge Luttig relied on a description of the conventional D & E that assumed dismemberment in the uterus and fetal demise prior to delivery of any portion of an intact fetus into the vagina. 144 F.3d at 330. He also indicated that "normal" D & E procedure in Virginia called for severing the umbilical cord of the fetus while it remained in uterus, causing fetal demise before anything is delivered into the vagina. *Id.* This is simply not the practice in Kentucky. Hearing Transcript, 206. Judge Luttig did not consider how the term "substantial portion thereof" greatly expands the breadth of the medical procedures which the Virginia statute might proscribe. Under Judge Luttig's facts, such an analysis may have seemed unnecessary. The breadth of those words is critically significant, however, under the facts of our case. In the final analysis, neither Judge Luttig's analysis nor the facts of his case can decide this one.

### VI.

By declaring the Act facially unconstitutional, the Court does not mean to imply that every provision of the Act offends the Constitution. That declaration follows only from the effect of the Act on pre-viability abortions performed in Kentucky. The Act, however, bans partial birth abortions no matter when in pregnancy they are performed. *Cf.*

**19.** For instance, the Court's analysis set forth in Section IV(A) of this Memorandum is consistent with Judge Luttig's analysis.

**20.** In the course of this opinion the Court has already discussed and distinguished Judge Luttig's analysis from the material aspects of this case. Judge Luttig placed special importance upon evidence that Virginia authorities would not prosecute physicians performing a D & E. In

Section V(C) of this Memorandum, the Court discusses why a statement by Defendants' counsel in this case is not so persuasive. Judge Luttig also placed importance on the *mens rea* provisions. In Section V(B) of this Memorandum, the Court discussed why the different medical practices in Kentucky make Judge Luttig's *mens rea* analysis inapplicable to this case.

*Voinovich*, 130 F.3d at 202 (explaining that Ohio banned the partial birth abortion procedure "without reference to viability"). The Court, thus, faces two questions: (1) whether it is possible to sever the definition section and leave a constitutional statute behind and (2) whether it is possible to sever the pre-viability application of the Act from its post-viability application.

■ The answer to the first question—the severability of the definition provision—is an easy one. When a legislature bans a partial birth abortion, its prohibition has meaning only by reference to the legislature's definition of that procedure. Where the overbreadth of that definition causes a constitutional problem, a court would only compound the problem by deleting the specific definition. Nothing intelligible would remain. Therefore, severing the definition section is not an option.

■ The second question—the severability of pre- and post-viability application—poses a more difficult problem. Nothing in the Act distinguishes between pre- and post-viability. There is no particular section, paragraph, sentence, or word that the Court could strike leaving behind any coherent remains. A decision from the Sixth Circuit, and from the Kentucky Supreme Court as well as a Kentucky's general severability statute all suggest that this Court should not introduce new terms or add a narrowing interpretation to a statute in order to save a portion of it. *See Eubanks v. Wilkinson*, 937 F.2d 1118, 1121–1128 (6th Cir.1991); *Musselman v. Commonwealth*, 705 S.W.2d 476, 477 (Ky.1986); KRS 446.090.[21] These cases parallel the more recent resolution of the Sixth Circuit in *Voinovich* where the court also explained that a federal court cannot rewrite a state statute through severance to save it. *Voinovich*, 130 F.3d at 202.

Thus, the Court sees no way to limit the application of the Act to post-viability partial birth abortions without rewriting the Act, and, thus, intruding upon the province of the legislature. Therefore, the Court must enjoin enforcement of the entire Act.

## VII.

Plaintiffs have raised two additional objections to the Act, each of which may have considerable merit. First, Plaintiffs say that the absence of a provision allowing physicians to perform partial birth abortions post-viability to protect the health of the woman makes the Act unconstitutional. Second, they said that as a fundamental principle of due process, the state must have some rational basis for the regulation contained in the Act. They say that none exists. Because the Court has already found the Act facially unconstitutional as an impermissible burden on pre-viability abortions in Kentucky, it need not reach a conclusion on these remaining issues. By treating these issues only briefly, the Court does not mean to minimize their importance.

### A.

Kentucky Revised Statute § 311.990(11)(a)(1) provides that "a physician shall not be guilty of the criminal offense if the partial-birth abortion was necessary to save the life of the mother whose life was endangered by a physical disorder, illness, or injury." The Act contains no exception to preserve the "health" of the woman.

The absence of the health exception would seem to raise fundamental concerns under binding Supreme Court precedents. In *Casey*, the Supreme Court explained that even after viability, when a state's interest in protecting potential life is greatest, a state could not proscribe abortion without providing an exception for an appropriate medical judgment that an abortion is necessary " 'for the preservation of the life or *health* of the mother.' " 505 U.S. at 879, 112 S.Ct. 2791 (quoting *Roe v. Wade*, 410 U.S. at 164–65, 93 S.Ct. 705) (emphasis added). The Sixth Circuit recently underscored this concern in *Voinovich*, quoting from both *Casey* and *Roe*, to demonstrate the Supreme Court's consistent

---

**21.** An earlier Kentucky case, *Kentucky Municipal League v. Commonwealth*, 530 S.W.2d 198 (Ky. 1975), contains some seemingly contrary language suggesting that courts can sever any part of a statute. However, in that case the statute in question contained its own severability clause, which the partial birth abortion statute does not.

view. *Voinovich,* 130 F.3d at 197. The legislature's failure to include the health exception could prevent physicians from exercising appropriate medical judgment as to some post-viability abortions. This has rather obvious constitutional implications.

Because the Court cannot sever the pre-viability application of the Act from its post-viability application, the Court must enjoin the enforcement of the entire Act irrespective of any further consideration of the absence of the health exception.[22]

### B.

Plaintiffs assert that the Act violates the due process protection against substantially arbitrary and purposeless restraints. *See Casey* 505 U.S. at 848, 112 S.Ct. 2791; *Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 79, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). On the other hand, Defendants spend considerable effort to convince the Court that the legislature's purpose was valid. They discuss the Haskell procedure at length and explain that it is unnecessary, dangerous, inhumane and painful to the fetus. These two opposing arguments raise profound issues. However, neither party has provided the Court with sufficient evidence to reach a fully informed decision.

Defendants make a valid point in their assessment of the post-viability Haskell procedure and the legislature's interest in prohibiting true infanticide. However, whether the same can be said about a pre-viability D & X is not at all clear. Several courts have questioned the validity of the state's interest in such a prohibition. *See Women's Medical Professional Corp. v. Voinovich,* 911 F.Supp. 1051, 1074–75 (S.D.Ohio 1995), *aff'd* on other grounds 130 F.3d 187 (6th Cir.1997); *Planned Parenthood of Wisconsin v. Doyle,* 162 F.3d 463, 469–471 (7th Cir.1998). Though the record is far from complete, Defendants here seem unable to answer those questions very well and sometimes not at all.

For instance, nothing in the evidence would seem to establish that limiting fetal pain is a legitimate purpose of this Act. After all, it is hard to imagine that even the gruesome partial birth abortion procedure would be more painful to a fetus than being torn apart limb by limb as in an ordinary D & E procedure. No one seems to argue that the Act has as one of its legitimate purposes the protection of the mother's health. To be sure, the legislature has the right to express its moral outrage in the form of criminal statutes. However, that outrage cannot act to condemn conduct which is constitutionally protected.

In any event, for purposes of this Memorandum the Court assumed the legislature's purpose is to be valid. However, even an otherwise valid purpose could not save the unconstitutional effect of those words.

### VIII.

The battle over abortion rights and the right to life has produced some bitter divisions among both political leaders and judges. In *Casey,* for instance, a minority of four justices decried the *Roe* precedent and the majority's refusal to overrule it.

The minority reserved especial disdain for the "undue burden" or "substantial obstacle" test, which has been the focus of this Court's analysis. The dissenters asserted that, "consciously or not, the joint opinion's verbal *shell game* will conceal raw judicial policy choices concerning what is 'appropriate' abortion legislation." 505 U.S. at 987, 112 S.Ct. 2791 (emphasis added).[23] As a consequence, they foresaw

The inherently standardless nature of this [undue burden] inquiry, invites the district judge to give effect to his personal preferences about abortion. By finding or relying upon the right facts, he can invalidate, it would seem, almost any abortion restriction that strikes him as "undue"—subject, of course, to the possibility of being reversed by a court of appeals or Supreme

---

22. This also means that the Court need not consider the complex question of whether Plaintiffs would have standing under Article III to challenge the Act's post-viability application.

23. In his dissent in *Voinovich,* Judge Boggs uses a similar game analogy of Lucy constantly pulling the football away from Charlie Brown at the last minute because he does not get it just right.

Court that is as unconstrained in reviewing the decision as he was in making it.

*Id.* at 992–993, 112 S.Ct. 2791. Their concerns have merit and deserve a response in the context of this decision.

That the "undue burden" standard is difficult to apply in these circumstances, few could deny. One should not expect the easy accommodation of such dramatically opposing rights. Neither the difficulty of the task nor the sensitivity of the issues, however, should have us believe that judges will resort merely to a personal preference. Rather, we are challenged to do our duty which is to faithfully and impartially declare what the law is.

While judicial opinions are mandates, they are also part of a continuing conversation between elected officials and the judiciary. In a shell game, one has no better chance of knowing the correct answer after one try than after the next. In our constitutional conversation, that is simply not so. Judges give reasons for their decisions. Those reasons are based upon the evidence in their case and the opinions of higher courts. By giving reasons, we help guide further conversation. Were this decision only a mandate, the conversation would be over. That other courts may choose to agree or disagree, that the legislature may respond, shows that this decision enhances and informs the on-going democratic process.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court has considered the pending motions upon the pleadings, stipulations, evidence and arguments of counsel. The Court has issued a Memorandum Opinion concluding that the provisions of the Act of the General Assembly of Kentucky and signed by the Governor of the Commonwealth of Kentucky on April 14, 1998, Senate Bill 121, 1998 Kentucky Acts Chapter 578, and designated "AN ACT Relating to Abortion" and referred to as "Kentucky's Partial Birth Abortion Ban" (the "Act") which purports to ban the practice of partial birth abortions, are unconstitutional and invalid. Therefore, Plaintiffs are entitled to the relief sought.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants and their successors in office and all others acting on behalf of them are hereby perpetually and permanently enjoined and restrained from enforcing or attempting to enforce the provisions of the Act.

This is a final and appealable order.