Samuel G. EUBANKS, Jr., M.D.,
et al.   Plaintiffs

v.

C. William SCHMIDT,
et al.   Defendants

No.  CIV.A.3:99CV107H.

United States District Court,
W.D. Kentucky.

Dec. 21, 2000.

Kimberly K. Greene, Dinsmore & Shohl, David A. Friedman, Fernandez, Friedman, Grossman & Kohn, Gary W. Anderson, Louisville, LA, for Plaintiffs.

E.D. Klatte, Office of General Counsel, Cabinet for Health Services, Frankfort, KY, Mark D. Guilfoyle, Richard G. Meyer, Deters, Benginger & LaVelle, Covington, KY, C. Lloyd Vest, II, Kentucky Board of Medical Licensure, LA, for Defendants.

**1.** House Bill 85, Kentucky's Informed Consent Statute, is set forth in full in the appendix to this Memorandum Opinion.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This Court now considers whether Kentucky's Abortion Informed Consent Statute, KY. REV. STAT. § 311.725 (Michie Supp. 2000) (the "Informed Consent Statute" or the "Statute") is valid and enforceable under the United States Constitution. The Statute's provisions are similar to the portions of the Pennsylvania law which the Supreme Court upheld in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Like the Pennsylvania law, the Statute requires that physicians inform women about certain specific medical and social information and offer them two state published pamphlets at least twenty-four hours before any abortion procedure. One pamphlet describes fetal development and the other pamphlet lists resources available to the woman. Unlike the Pennsylvania law, the Kentucky Statute requires physicians to pay for the costs of these pamphlets.[1]

█ Women have a right to choose to have an abortion before viability and to obtain it without the state imposing any undue burden. *Casey*, 505 U.S. at 878, 112 S.Ct. 2791. States have legitimate interests as well. Here, the state legislature wanted women seeking abortions to make a more informed and deliberate decision, no doubt hoping that they would opt for childbirth instead. *See Casey*, 505 U.S. at 883, 112 S.Ct. 2791 (holding that a state may express a preference for childbirth over abortion). The issue in this case is whether the legislature reasonably asserted the state's legitimate interests without unduly compromising the constitutional rights of women.

Many of the same legal principles which the Court set out in *Eubanks v. Stengel*, 28 F.Supp.2d 1024 (W.D.Ky.1998), guide the analysis here.[2] Because the Statute and

**2.** In *Eubanks*, this Court reviewed Kentucky's Partial Birth Abortion Act and recognized three distinct rights—"the state's interest in protecting potential life; the woman's right to terminate her pregnancy and to be free from

the Pennsylvania law are similar, logic suggests that *Casey* controls the outcome in this case. However, *Casey* does not preordain that result. The Supreme Court left open the possibility that future plaintiffs could prove that a similar regulation might be unconstitutional. *Casey*, 505 U.S. at 887.

The Court concludes that the Statute does not violate the United States Constitution. It has substantially similar effects as the law upheld in *Casey*. Plaintiffs have not shown a greater undue burden on women seeking an abortion in Kentucky. The requirement that physicians pay the cost of the state pamphlets does not offend the First Amendment of the Constitution.

## I.

■■■ Plaintiffs ask the Court to permanently enjoin enforcement of the Statute on behalf of themselves and their patients.[3] The Court has federal question jurisdiction because Plaintiffs challenge a state statute under the United States Constitution. 28 U.S.C. § 1331 (2000). Plaintiffs can assert both their own constitutional claims as well as those of their patients. As physicians, they may face disciplinary proceedings under the Statute and, thus, may seek pre-enforcement review. *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Their patients face many practical obstacles to asserting their own claims. *Singleton v. Wulff*, 428 U.S.

106, 115–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Eubanks*, 28 F.Supp.2d at 1029.

## II.

To analyze the Statute and its potential impact, one must first understand the current informed consent procedures at abortion clinics. The parties generally agree on current practice.

A woman who believes that she is pregnant calls the clinic for an appointment. At that time, she is asked to estimate the gestation age of her fetus based on her last menstrual period. The clinic tells her what she must bring to her appointment. For example, she is told the cost of the procedure and that she must have someone drive her home after the procedure. The woman is free to ask any questions about the procedure or possible alternatives. However, the clinic does not initiate counseling at that time. Upon arrival for her appointment, each woman must pay for the procedure in cash. If the woman cannot pay in full, her appointment is rescheduled. Upon payment of the fee, the woman receives an ultrasound to determine gestation age of her fetus.[4] The woman is then ushered into a room with other women where they are shown a film that describes the abortion procedure and its risks. After the film, each woman speaks one on one with a clinic counselor. If the woman expresses ambivalence, the counselor encourages her to reschedule the procedure. Otherwise, the counselor

an undue burden on that right; and the physician's due process right to know clearly when otherwise legitimate conduct becomes criminal"—implicated by the abortion legislation. 28 F.Supp.2d at 1027. Applying *Casey* 's undue burden standard, this Court determined that the Partial Birth Abortion Act would create an undue burden on a large fraction of women who sought to exercise their right to choose. *Id.* at 1037. This undue burden, along with other factors, rendered the Partial Birth Abortion Act unconstitutional. The Supreme Court reached the same conclusion in its examination of a similar Nebraska statute and referred to this Court's *Eubanks* decision in *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 2615, 147 L.Ed.2d 743 (2000). The Sixth Circuit, relying on *Stenberg*, affirmed

this Court's *Eubanks* decision. *Eubanks v. Stengel*, 224 F.3d 576 (6th Cir.2000).

3. The parties have agreed to delay enforcement of the Statute until after this Court rules on its constitutionality.

4. If the ultrasound shows that the fetus is under six weeks old, then the woman must reschedule her appointment for a later date. If the ultrasound shows that the fetus is older than expected, then the woman will have to pay an additional amount or reschedule. The woman may also have to reschedule if the fetus is so much older that the procedure cannot be performed in one day.

asks the woman to sign an informed consent form. Thereafter, anesthesia is administered, if used, and the physician can begin the procedure. The entire procedure—from the time a woman arrives for her appointment until she leaves—takes approximately half a day.

## III.

The Informed Consent Statute's avowed purpose is to change the manner in which women make the decision to proceed with an abortion. The Statute does this in much the same manner as the Pennsylvania law at issue in *Casey.* However, the Statute's precise requirements are not entirely clear. For instance, the Statute requires that at least twenty-four hours prior to an abortion procedure, physicians provide all patients with specific medical and social service information. Plaintiffs and Defendants disagree over whether the Statute requires one or two trips to the abortion provider to satisfy the requirement that the information be provided in an "individual, private setting." Plaintiffs argue that a telephone call meets the statutory requirements while Defendants claim that the Statute requires an in-person visit to accurately determine the age of the fetus.

The Court cannot say that the Statute actually requires two visits. Its plain language may allow some telephone consultations. Based on the evidence, however, the Court concludes that some women would find it extraordinarily difficult to comply with the Statute without two personal visits if they ask to review the pamphlets. Absent a federal constitutional challenge, this Court would have no reason to clarify the Statute's potential ambiguity. However, one reasonable statutory interpretation raises obvious constitutional issues. To determine the Statute's constitutionality, therefore, this Court must assume that the Statute requires two visits for some women.

## IV.

Plaintiffs bring a facial challenge. Such a challenge faces high hurdles because courts are reluctant to decide cases based on uncertain future events. *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Consequently, judges and academics continue to debate the precise contours necessary for a successful facial challenge. *See, e.g., City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); Matthew D. Adler, *Rights Against Rules: The Moral Structure of American Constitutional Law,* 97 Mich. L. Rev. 1 (1998); Richard H. Fallon, Jr., *As–Applied and Facial Challenges and Third–Party Standing,* 113 Harv. L. Rev. 1321 (2000). The Supreme Court, however, addressed the test for facial challenges to abortion regulations in *Casey,* 505 U.S. at 878–79, 112 S.Ct. 2791. *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 2604, 147 L.Ed.2d 743 (2000). *Casey's* new framework displaced the traditional rules regarding facial challenges. *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 194 (6th Cir.1997) (concluding that "[a]lthough *Casey* does not expressly purport to overrule *Salerno,* in effect it does"); *Eubanks v. Stengel,* 28 F.Supp.2d 1024, 1030 (W.D.Ky.1998).

Recognizing that *Casey* governs a facial challenge is the easy part of this analysis. Actually applying the *Casey* facial challenge standard, even where the statutes and surrounding facts are quite similar to *Casey,* requires careful examination. To do so, the Court first applies the test set out in *Casey* to the evidence presented in this case. Then, the Court explores the potential differences between the Kentucky and the Pennsylvania statutes.

### A.

■ As in *Casey,* Plaintiffs here argue that the Statute particularly restricts those women who must travel long distances, who have few financial resources, and who have difficulty explaining their absence to employers, spouses, or others. In *Casey,*

the Supreme Court held that a state may enact abortion informed consent laws, so long as such regulations do not place an "undue burden" on the woman's right to terminate her pregnancy. 505 U.S. at 872–74, 112 S.Ct. 2791. A law poses an "undue burden" if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791. Understanding why the Supreme Court applied the test differently to the waiting period and spousal notification provisions of the Pennsylvania law helps to illuminate this enigmatic test.[5]

■ The Supreme Court first determined that the Pennsylvania informed consent and waiting period provisions were "reasonable measure[s] to ensure an informed choice," and, therefore, did not have the purpose of creating a substantial obstacle. *Id.* at 883, 112 S.Ct. 2791. To so hold, the Court distinguished between permissible and impermissible purposes. The state may pass a law aimed at decreasing the number of abortions so long as the law strives to reach this goal by influencing the woman's choice, even if that law "might cause the woman to choose childbirth over abortion." *Id.* at 877, 883, 112 S.Ct. 2791.

The Supreme Court then considered whether the informed consent provision had the practical effect of producing a substantial obstacle. Adopting the district court's findings that a twenty-four hour waiting period would require two trips to the clinic, the Supreme Court presumed this would cause inconvenience, increased cost and additional medical risk for some women. These consequences, it agreed, would particularly burden those women having the least resources and the farthest distances to travel. The plurality opinion

expressed some concern about this burden, but concluded that to find a statute particularly burdensome to a certain group does not establish that it is a substantial obstacle for that group. *Id.* at 887, 112 S.Ct. 2791.

The Supreme Court reached a different conclusion concerning the spousal notification requirement. Without impugning the law's purpose, the Court held that its effects would prevent a certain group of women from exercising their right to choose an abortion. For a "large fraction" of a specific, identified group—"married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions"—the law "will operate as a substantial obstacle" and is therefore unconstitutional. *Id.* at 895, 112 S.Ct. 2791.

■ *Casey* provides some helpful guidance. First, Kentucky can require informed consent for abortion just as it can for any other medical procedure. Second, a waiting period law of this kind has a legitimate purpose and does not strike directly at a woman's right to choose. Third, to succeed in a facial challenge, Plaintiffs must show that the Statute will have the direct and practical effect of preventing a "large fraction" of women for whom the law is relevant from obtaining the abortion they seek. *Id.* at 895, 112 S.Ct. 2791; *Fargo Women's Health Org. v. Schafer,* 507 U.S. 1013, 1013, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993) (O'Connor, J. and Souter, J., concurring). Fourth, they must show more than an incidental effect of creating a greater cost or burden on those women having fewer resources, farther to travel, or an uncooperative spouse

5. For purposes relevant to this analysis the Pennsylvania and Kentucky informed consent statutes are identical. The Pennsylvania statute required that a physician inform the woman regarding the nature of the procedure, health risks of abortion and childbirth, probable gestational age, and availability of state-printed pamphlets at least twenty-four hours prior to obtaining an abortion. *Casey,* 505 U.S. at 881, 112 S.Ct. 2791. The spousal notification law required that a married woman seeking an abortion sign a statement indicating that her spouse has been notified of her intent to undergo an abortion. *Id.* at 887, 112 S.Ct. 2791.

or employer. Absent such proof, *Casey* controls this case.

## B.

■ To analyze our facts under the *Casey* criteria, this Court must define the "group for whom the law is a restriction." *Casey*, 505 U.S. at 894, 112 S.Ct. 2791. Within such a group, the Court must determine how many of these women would face a substantial obstacle due to the Statute. While the Statute places an identical legal restriction on every woman seeking an abortion, its actual restriction on each woman is different and unique. Determining the relevant group is made more complex because irrespective of the Statute, substantial preexisting obstacles confront women contemplating an abortion. Women have difficulty obtaining funds, coordinating transportation, and maintaining confidentiality, not to mention resolving their own moral and family dilemmas. For those women already so affected that they cannot obtain an abortion, the Statute changes little. The Court, therefore, cannot include those women as part of the constitutional analysis. This Court will consider the group of women who can currently obtain abortions as the group for whom the law is a restriction, since the Statute forces all of them to wait twenty-four hours.[6]

To be sure, the Statute's waiting period does make abortions marginally more expensive and more difficult to obtain. It will operate as a substantial obstacle, however, only for those women at the margins who could have obtained an abortion under the old procedure, but who cannot under the new procedure. For many others that marginal increase in cost and inconvenience will not affect their ability to obtain an abortion. To assess the constitutionality under *Casey*, this Court must analyze the relative size of that group of women at that margin.

Precisely at this critical juncture the evidence fails. It is only speculation to suggest that the Statute prevents a large fraction of the defined group from exercising their right to choose. Simply put, the twenty-four hour informed consent period makes abortions marginally more difficult to obtain, but, unlike the spousal consent requirement, it does not fundamentally alter any of the significant preexisting burdens facing poor women who are distant from abortion providers.[7]

## C.

Plaintiffs presented the Mississippi study to show that the Statute could impact Kentucky women contemplating abortions quite differently than those in Pennsylvania. The Mississippi study measured declines in the number of women having abortions after the implementation of that state's twenty-four hour waiting period.[8]

---

6. The *Casey* Court states that the Statute "must by judged by reference to those for whom it is an actual rather than irrelevant restriction." *Casey*, 505 U.S. at 895, 112 S.Ct. 2791.

7. This Court notes that *Casey* did not specifically articulate why the burdens created by the waiting period did not affect a large fraction of women compared with the burdens created by the spousal notification requirement. One important, perhaps determinative, difference between the two regulations is that the spousal notification requirement fundamentally changes the character of the process by forcing the inclusion of a third party while the waiting period only increases already existing obstacles.

8. Several courts have examined the Mississippi Study and have come to differing conclusions about its probative value. *Compare Karlin v. Foust*, 188 F.3d 446, 487 (7th Cir.1999) (finding that the "Mississippi Study's most significant shortcoming, however, is that it failed to adequately control for the persuasive effect of the law") *with A Woman's Choice–East Side Women's Clinic v. Newman*, 980 F.Supp. 962, 973 (S.D.Ind.1997) (finding "no evidence" that the decline "would be the result of [the] law's persuasive effect"); *Pro–Choice Mississippi v. Fordice*, 716 So.2d 645, 668 (Miss.1998) (Sullivan, J. dissenting) (stating that the Mississippi Study provided sufficient evidence to present a genuine issue of fact).

Dr. Theodore Joyce, a statistician, concludes that Mississippi's twenty-four hour waiting period law caused the number of women having abortions in Mississippi to decrease by ten to thirteen percent. This decline, Plaintiffs assert, arose from the burden caused by the waiting period. Merely identifying that some women will not have an abortion under the new law does not, on its own, differentiate the Kentucky Statute from the statute in *Casey*.

The studies do not answer the critical question: *why* do some women who are forced to wait twenty-four hours ultimately not have an abortion? Many factors affect a woman's decision to have an abortion.[9] The waiting period law may be one of them. However, little reliable data shows what actually motivates decision making. The comparison to states with shorter waiting periods does not control for the permissible, persuasive effect of waiting twenty-four hours. The different trends of women leaving and entering the state to obtain abortions similarly does not tell one *why* some women may decide not to have abortions. It is a reasonable inference that many women seek to avoid the Statute's permissible persuasive measures. In other words, they may leave to avoid any number of burdens but their departure offers no insight as to how undue any of those burdens are. The failure of the "no show" rate at the abortion clinics to increase after the law was implemented also offers little assistance. That some women fail to keep their appointments does not explain why (or whether) they ultimately do not have an abortion. Moreover, studies from other states, though perhaps less comprehensive in nature, either do not val-

idate Dr. Joyce's conclusions or actually cast doubt on them.

The Mississippi study proves no more than the same kind of difficulties and impediments which the district court found in *Casey*. The essential requirement of *Casey*, however, is that one distinguish between those incidental effects of the Statute which make the right to choose more inconvenient of costly and those direct effects which actually prevent women from obtaining an abortion. The Mississippi study, even with its enhancements, does not prove such direct effects. Because *Casey* did not point to specific factors or clear criteria, Plaintiffs must identify significant different impacts of the two waiting periods to remove the Statute from the presumption of constitutionality *Casey* establishes.[10] The Court finds that the differences between the two waiting periods are not sufficient to constitutionally differentiate the Kentucky Informed Consent Statute from *Casey*.

## V.

Finally, Plaintiffs say the Statute violates their First Amendment rights by compelling them to pay for and distribute ideological speech with which they disagree. The Statute requires physicians to inform every patient (1) that the state publishes printed materials which provide medical and pregnancy assistance information, (2) that she has a right to review those materials if she chooses, and (3) that the physician will provide the materials free of charge. One pamphlet illustrates various stages of fetal development while the second provides names and phone numbers of a wide variety of groups that offer services or advice to pregnant wom-

9. For example, changes in the cost of services; the number of providers, the availability or use of birth control; the social support for abstinence, abortion, or childbirth; the stigma associated with abortion or bringing a child to term; the success of adoption and other programs that provide women with alternatives to abortion; and the effectiveness of the state's persuasive measures can all affect the number of abortions in a given year.

10. Plaintiffs have pointed to many differences between Kentucky and Pennsylvania and the manner in which abortions are provided in each state. However, they have not proven different direct consequences of the two statutes.

en. The physicians must purchase these pamphlets from the state at the state's cost, currently about four dollars.

In *Casey,* the Supreme Court disposed of a somewhat similar First Amendment challenge in a single conclusory paragraph. It recognized the potential First Amendment ramifications of requiring physicians to distribute pamphlets, but held those requirements not to be a violation:

> To be sure, the physician's First Amendment rights not to speak are implicated, see *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. *Whalen v. Roe,* 429 U.S. 589, 603, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Casey,* 505 U.S. at 884, 112 S.Ct. 2791. Justice O'Connor's plurality opinion contained no other discussion of whether the compelled speech at issue in *Casey* was ideological. The Supreme Court has consistently invalidated schemes which compel ideological speech. *See, e.g., Keller v. State Bar of Cal.,* 496 U.S. 1, 14, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 235, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Presumably, had Justice O'Connor thought that the state sponsored materials in *Casey* were an ideological statement, she would have said so.[11] Instead, she classified the informed consent pamphlets as little more than the requirement that the physician provide certain medical facts and agency information to patients as part of a comprehensive medical regulatory scheme.[12]

11. The possible ideological component of the informed consent requirement is an interesting and important enough issue to deserve more discussion. Dissenting in *City of Akron v. Akron Center for Reproductive Health, Inc.,* Justice O'Connor stated that informed consent provisions may "violate the First Amendment rights of the physician if the State requires him or her to communicate its ideology." 462 U.S. 416, 472 n. 16, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *overruled by Casey,* 505 U.S. at 882, 112 S.Ct. 2791. Justice O'Connor's plurality in *Casey* repeatedly refers to the requirement that the material be truthful and nonmisleading. *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), which concerned ideological speech, is probably cited only for the proposition that the First Amendment implicates the right not to speak as well as the right to speak. *Id.* at 714, 97 S.Ct. 1428 (holding that the First Amendment right "includes both the right to speak freely and the right to refrain from speaking at all"). The Supreme Court's reference to *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), suggests that Justice O'Connor believed these pamphlets to convey information reasonably related to informed consent, not ideology.

Nevertheless, it is easy to see why some would disagree. In some minds it is impossible to separate the ideologically focused anti-abortion political campaign from the nonideological content of the medical and social information contained in the pamphlets. For the ardent supporters on either side, the issue of abortion is a political, cultural, moral and legal war, whose various battles and scrimmages are no less a part of the war. To force any one of them to side with the enemy even in a small clash in that war is to enlist them in the other side's army. This is understandably abhorrent to the participants. It would be as if the legislature passed a statute requiring every physician to advise women of their right to have an abortion. Such a statute might be equally justified as the one here and equally objectionable to a large number of physicians.

Simply because a subject is controversial, however, does not make it ideological. It is possible to convey information about ideologically charged subjects without communicating another's ideology, particularly in the context of the reasonable regulation of medical practice. Though the legislature passed this Statute to further its preference for birth over abortion; the pamphlets do not overtly trumpet that preference. They provide information from which a woman might naturally select the choice favored by the legislature. By viewing the pamphlets as merely providing information and citing *Whalen v. Roe,* the Supreme Court seems to make precisely that point.

12. It is worth mentioning several points about the compulsion here. The physicians first requirement is only to inform the woman of the availability of the materials. Only if she

Irrespective of the Supreme Court's limited discussion, one must recognize an overriding imperative: If Kentucky's pamphlets and the resulting infringement on speech are legally indistinguishable from those presented in *Casey*, then *Casey* controls.

### A.

■ First, Plaintiffs attempt to differentiate our case from *Casey* by arguing that the Kentucky pamphlets provide inaccurate, misleading, and ideological information. Having carefully reviewed the relevant materials, the Court respectfully disagrees and finds the relevant materials to be quite similar.

The Court notes that the Statute itself requires that the descriptive materials be "objective and nonjudgmental, and shall include only accurate scientific information." KY. REV. STAT. § 311.725(2)(b). This evidences the legislature's legitimate intention. The Court believes that the Cabinet for Human Resources has met this reasonable statutory requirement. True, some of the fetal development photographs are color enhanced and other photos are enlarged. Even so, the photographs are neither misleading nor untruthful. Regardless of their size, photographs do not become misleading so long as the statutorily required scale allows an average person to determine their actual size. Nor does the color enhancement make an otherwise accurate depiction misleading. The pictures provide an accurate rendition of the fetus at various stages of development, as required by the Statute. Plaintiffs do not seriously challenge any of the other scientific and medical informa-

tion contained in the fetal development pamphlet. Therefore, the Court finds that these materials are "truthful and not misleading." *Casey*, 505 U.S. at 882, 112 S.Ct. 2791.

The Statute requires the Kentucky Cabinet for Human Resources to create materials that "inform the pregnant woman about public and private agencies and services that are available to assist her." KY. REV. STAT. § 311.725(2)(a). These materials must "include a comprehensive list of available agencies [and] the cabinet shall ensure that the materials are comprehensive and do not directly or indirectly promote, exclude, or discourage the use of any agency or service described." *Id.* The Court concludes that Defendants have complied with the Statute's requirements. The state created the pamphlets through a reasonably fair and open process, not one designed to circumvent *Casey's* accuracy requirements. The list of resources is fair and balanced.[13] As best the Court can discern, the pamphlets at issue here are quite similar to those in *Casey*.

True, the evidence at trial demonstrated that one of the agencies listed on the Kentucky pamphlet does provide misleading information. These inaccuracies create a potentially difficult question. Distortions or lies spread by one agency listed on the pamphlet could invalidate the legitimacy of the materials if the distortions amounted to a circumvention of the statutory requirements of accuracy. *Casey* does not require, however, that every statement made by every agency identified be truthful and nonmisleading, merely that the pamphlets themselves meet those requirements. Indeed, the Supreme Court in *Ca-*

requests the pamphlets must the physician deliver them. The physician need not vouch for the pamphlets. The pamphlets, in fact, identify the state as the author and nowhere specify that the physician paid for the pamphlets. Furthermore, the physician is free to delivery her own message, criticizing, disavowing, or explaining the state pamphlet. To be sure, the physician must deliver the state compelled materials. However, there should never be an occasion in which that message is

mistaken for the physician's own. For all these reasons, our case seems consistent as possible with existing jurisprudence.

**13.** Plaintiffs' complaint that the pamphlet does not list abortion providers seems quite immaterial. The women have already contacted an abortion provider and presumably do not need another.

*sey* was confronted with the District Court's finding that the Pennsylvania pamphlet's list "includes crises pregnancy centers and other organizations which provide women with misinformation and inflammatory literature which increases pre-abortion anxiety." *Planned Parenthood of Southeastern Pa. v. Casey,* 744 F.Supp. 1323, 1350 (E.D.Pa.1990). The Kentucky pamphlets seem much less offensive than those approved in *Casey.* That one agency identified on the Kentucky pamphlet made nontruthful and misleading statements is too tenuous a connection between the false statements and the state pamphlets to render the pamphlets unconstitutional.

The Court concludes that distributing these pamphlets is a reasonable measure to insure adequate informed consent in all cases of abortion. *Casey,* 505 U.S. at 882–883, 112 S.Ct. 2791. The content of the Kentucky materials is similar to those in *Casey.* That content falls well within constitutional limits for which *Casey* stands.

## B.

■ The Court finds only one significant difference between Kentucky's statutory scheme and the one upheld in *Casey.* Kentucky charges physicians four dollars for each set of the required pamphlets; Pennsylvania imposed no fee. This raises the constitutional question of whether requiring physicians to purchase the pamphlets adds an impermissible level of compulsion or infringement upon their right of free speech.

In fact, it is not clear that requiring the physicians to pay for the pamphlets changes the constitutional analysis to any extent. After all, the Statute compels delivery of the materials irrespective of the fee. Defendants have justified compelling delivery of the message consistent with the strictures of *Casey.* The fee does not create or increase the compulsion and unlike many other cases the payment is neither the speech nor the compulsion. *See, e.g., Glickman v. Wileman Brothers & Elliott, Inc.,* 521 U.S. 457, 469–70, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 769–70, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). The speech and the compulsion already existed in our case.

Clearly, the legislature did not need to charge the fee. The expense is a small one which the state treasury could easily bear. It amounts to a galling indignity for many physicians. For legislators, it is the price paid to find a majority to favor passage of the Statute. These frustrations or compromises do not, however, implicate the Statute's constitutionality.[14] Many cases hold that the state must have a "vital policy interest" to justify any significant burden on speech. *See, e.g., Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 519, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991); *Wileman Bros.,* 521 U.S. at 485, 117 S.Ct. 2130 (Souter, J., dissenting). Also present throughout this line of cases, however, is the statement that the regulation at issue must only be reasonable to implement the state interest. In *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* 466 U.S. 435, 448, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), the Court held that "the test must be whether the challenged expenditures are necessarily or reasonably incurred" to enact the state's policy interest. This reasonableness test was reaffirmed in *Keller v. State Bar of California,* 496 U.S. 1, 14, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), and even *Casey* upheld compelled speech that was "part of the practice of medicine, subject to *reasonable* licensing and regulation by the State." 505 U.S. at 884, 112 S.Ct. 2791 (emphasis added); *see also* Daniel Halberstam, *Commercial Speech, Professional Speech, and the Constitutional Status of Social Institutions,* 147 U. Pa. L. Rev.771, 837 (1999) (stating that the *Casey* "plurality appears to have imported a more stringent rationality review with

---

**14.** The Court reiterates that the most significant potential constitutional burden is compelling the actual speech, not requiring payment for the pamphlets.

some consideration of the First Amendment values 'implicated' in the communications between professional and client").

The Court concludes that to determine whether the fee passes constitutional muster, one must look at the Statute as a whole. It is not enough to say that compelling payment was unnecessary because the state could have paid from the treasury. It is reasonable and common for the state to require those it regulates in the public interest to pay some of the costs of that regulation. In our case, so long as the fee charged covers only the material cost of production and printing, then that fee is a reasonable part of the regulatory scheme. Therefore, the Kentucky Informed Consent Statute does not offend the United States Constitution in these circumstances.

The Court will enter an order consistent with this Memorandum Opinion.

## APPENDIX

This law, House Bill 85, later codified as KY. REV. STAT. 311.725 (Michie Supp.2000), requires that:

(1) No abortion shall be performed or induced except with the voluntary and informed written consent of the woman upon whom the abortion is to be performed or induced. Except in the case of medical emergency, consent to an abortion is voluntary and informed if and only if:

(a) At least twenty-four (24) hours prior to the abortion, a physician, licensed nurse, physician assistant, or social worker to whom responsibility has been delegated by the physician has verbally informed the woman of all of the following:

(1) At he nature and purpose of the particular abortion procedure or treatment to be performed and of those medical risks and alternatives to the procedure or treatment that a reasonable patient would consider to be material to the decision of whether or not to undergo the abortion;

(2) The probable gestation age of the embryo or fetus at the time the abortion is to be performed; and

(3) The medical risks associated with the pregnant woman carrying her pregnancy to term;

(b) At least twenty-four (24) hours prior to the abortion, in an individual, private setting, a physician, licensed nurse, physician assistant, or social worker to whom the responsibility has been delegated by the physician has informed the pregnant woman that:

(1) The cabinet publishes the printed materials described in paragraphs (a) and (b) of subsection (2) of this section and that she has a right to review the printed materials and that copies will be provided to her by the physician, licensed nurse, physician assistant, or social worker free of charge if she chooses to review the printed materials;

(2) Medical assistance benefits may be available for prenatal care, childbirth, and neonatal care, and that more detailed information on the availability of such assistance is contained in the printed materials published by the cabinet; and

(3) The father of the fetus is liable to assist in the support of her child, even in instances where he has offered to pay for the abortion;

(c) At least twenty-four (24) hours prior to the abortion, a copy of the printed materials has been provided to the pregnant woman if she chooses to view these materials;

(d) The pregnant woman certifies in writing, prior to the performance or inducement of the abortion:

(1) That she has received the information required to be provided under paragraphs (a), (b), and (c) of this subsection; and

(2) That she consents to the particular abortion voluntarily and knowingly, and she is not under the influence of any drug of abuse or alcohol; and

(e) Prior to the performance or inducement of the abortion, the physician who is scheduled to perform or induce the abortion or the physician's agent receives a copy of the pregnant woman's signed statement, on a form which may be provided by the physician, on which she consents to the abortion and that includes the certification required by paragraph (d) of this subsection.

(2) By January 1, 1999, the cabinet shall cause to be published in English in a typeface not less than 12 point type the following materials:

(a) Materials that inform the pregnant woman about public and private agencies and services that are available to assist her through her pregnancy, upon childbirth, and while her child is dependent, including, but not limited to, adoption agencies. The materials shall include a comprehensive list of the available agencies and a description of the services offered by the agencies and the telephone numbers and addresses of the agencies, and inform the pregnant woman about available medical assistance benefits for prenatal care, childbirth, and neonatal care and about the support obligations of the father of a child who is born alive. The cabinet shall ensure that the materials are comprehensive and do not directly or indirectly promote, exclude, or discourage the use of any agency or service described in this section; and

(b) Materials that inform the pregnant woman of the probable anatomical and physiological characteristics of the zygote, blastocyte, embryo, or fetus at two (2) week gestational increments for the first sixteen (16) weeks of her pregnancy and at four (4) week gestational increments from the seventeenth week of her pregnancy to full term, including any relevant information regarding the time at which the fetus possibly would be viable. The materials shall use language that is understandable by the average person who is not medically trained, shall be objective and nonjudgmental, and shall include only accurate scientific information about the zygote, blastocyte, embryo, or fetus at the various gestation increments. The materials shall include, for each of the two (2) of four (4) week increments specified in this paragraph, a pictorial or photographic depiction of the zygote, blastocyte, embryo, or fetus. The materials shall also include, in a conspicuous manner, a scale or other explanation that is understandable by the average person and that can be used to determine the actual size of the zygote, blastocyte, embryo, or fetus at a particular gestational increment as contrasted with the depicted size of the zygote, blastocyte, embryo, or fetus at that gestational increment.

(3) Upon submission of a request to the cabinet by any person, hospital, physician, or medical facility for one (1) or more copies of the materials published in accordance with subsection (2) of this section, the cabinet shall make the requested number of copies of the materials available to the person, hospital, physician, or medical facility that requested the copies.

(4) If a medical emergency or medical necessity compels the performance or inducement of an abortion, the physician who will perform or induce the abortion, prior to its performance or inducement if possible, shall inform the pregnant woman of the medical indications supporting the physician's judgment that an immediate abortion is necessary. Any physician who performs or induces an abortion without the prior satisfaction of the conditions specified in subsection (1)

of this section because of a medical emergency or medical necessity shall enter the reasons for the conclusion that a medical emergency exists in the medical record of the pregnant woman.

(5) If the conditions specified in subsection (1) of this section are satisfied, consent to an abortion shall be presumed to be valid and effective.

(6) The failure of a physician to satisfy the conditions of subsection (1) of this section prior to performing or inducing an abortion upon a pregnant woman may be the basis of disciplinary action pursuant to KRS 311.595.

(7) The cabinet shall charge a fee for each copy of the materials distributed in accordance with subsections (1) and (3) of this section. The fee shall be sufficient to cover the cost of the administration of the materials published in accordance with subsection (2) of this section, including the cost of preparation and distribution of the materials.